431 P.2d 575

Marvin R. COX, Plaintiff,

v.

J. R. BERRY, Defendant and Third-Party Plaintiff and Appellant,

v.

L. P. SLAGLE, Joseph Anderson, Vivian Schellar, Robert Graham and Riley Draper, Third-Party Defendants and Respondents.

No. 10744.

Supreme Court of Utah.

Aug. 24, 1967.

Thomas, Armstrong, Rawlings & West, David E. West, Salt Lake City, for appellant.

A. Ladru Jensen, Ronald C. Barker, Salt Lake City, for respondents.

CROCKETT, Chief Justice.

This action was instituted by Marvin Cox, plaintiff, against J. R. Berry, defendant, to collect $5,000 on a promissory note. The plaintiff's right to recover on the note is not the question raised on this appeal. Defendant Berry filed a cross-complaint against the respondents, five directors of Zions Investment Corporation, alleging that they had agreed to indemnify him for this note and other debts of that corporation. On the basis of the pleadings, affidavits and exhibits submitted by the parties, the trial court ruled that defendant Berry could show no right to recover against respondents and granted their motion for summary judgment, from which Mr. Berry appeals.

We emphasize that there appears to be sharp dispute about some of the essential facts. But in reviewing summary judgment, we are obliged to accept the facts as defendant Berry states them to be in his affidavit and contends that the evidence will demonstrate.[1]

During 1964 and most of 1965, Berry was president and general manager of Zions Investment Corporation, now in bankruptcy proceedings. In the latter part of 1964, in order to raise money to pay on some resort property known as The Homestead, in Wasatch County, being purchased for the corporation, he found it necessary to become personally obligated for various loans, one of which was the $5,000 note on which this case was initiated. In order to secure himself for these obligations, he took convey-

1. See Controlled Receivables, Inc. v. Harman, 17 Utah 2d 420, 413 P.2d 807, Thompson v. Ford Motor Co., 16 Utah 2d 30, 395 P.2d 62.

ance of The Homestead in his own name, instead of in the name of the corporation.

During the ensuing months some friction developed between him and the other directors. They asked him to resign and to transfer the title of The Homestead to the corporation. He was willing to do this upon the condition that they as individuals would assume the obligation of the note he had signed to get that asset for the corporation, and to this end he obtained from respondents the two written agreements upon which he now bases his claim for indemnification. The first of these was reached at a meeting at which Berry and five of the nine directors of the corporation were present (the respondents herein). An agreement was drawn up in longhand, apparently to express the conclusions reached at the meeting, and all who were present signed it. It was in substance that in exchange for Berry's resignation the directors of the corporation would personally assume the obligations he had taken upon himself in connection with the corporation's business.

■ Respondents' main contention is that these agreements are void because it would be against public policy for Berry to accept a pecuniary consideration to resign his office. There is no doubt that one who is elected as an officer or director of a corporation accepts a fiduciary responsibility to serve the interests of those who elect him which he must discharge with fidelity and which he should not desert for his own gain. If corporate officers could in effect be bribed to resign, the way would be open to nefarious machinations in corporate affairs. An officer or director can, of course, resign whenever he wants to. But his decision to do so should be made independent of any proffered monetary consideration. For these reasons we are in accord with the proposition advocated by respondents that generally an agreement for a corporate officer to resign his office for a pecuniary benefit to himself would be void.[2]

■ But it often happens that a blind and unreasoning application of a "general rule," in the absence of the circumstances it was intended to apply to, results in defeating rather than serving the interest of justice. It is hardly to be supposed that there is any rule which is to be applied universally and absolutely regardless of circumstances.[3] The only proper function of rules is to serve the ends of justice. They are intended to be applied to the circumstances in which justice demanded their creation to

2. Forbes v. McDonald, 54 Cal. 98 (1880); T. F. Pagel Lumber Co. v. Webster, 231 Wis. 222, 285 N.W. 739; 2 Fletcher Cyclopedia of Corporations § 348 (Perm. ed. 1954); 19 Am.Jur.2d Corporations § 1117 (1965).

3. See Whiting Bros. Const. Co. v. M & S Const. & Eng. Co., 18 Utah 2d 43, 414 P. 2d 961; Snyder v. Clune, 15 Utah 2d 254, 390 P.2d 915.

guard against an evil. Conversely, where the circumstances are such that no such evil or any likelihood of it exists, the rule has no proper application. And this is true, a fortiori, where invocation of the rule would bring about an unjust and inequitable result.

■ At this stage of the proceeding, viewing the situation in the light most favorable to Berry, the picture he paints emerges substantially thus: He was a corporate officer so dedicated to the success of the enterprise that he used his personal credit in order to obtain money to further its interests. While he was president and director he was willing to look to its success for his repayment. When the other directors wanted to oust him and take over responsibility it was but reasonable that they should agree to also take over the obligations he was carrying for the corporation. We do not see in this agreement that Berry was to resign his office, in return for which respondents were to take over his prerogatives and duties, as lending itself to any of the possible corrupt machinations the rule prohibiting a corporate officer from being bribed out of office was designed to guard against. And if this change was to be made, it would not seem unfair that respondents should relieve Berry of burdens he had assumed for the corporation in the office he surrendered. But it would seem unfair if

they took the benefits of the agreement and refused to give him what they promised in return. For the reasons stated above we see no justification for dismissing Berry's cross-complaint on the ground that the alleged agreement would be void as against public policy.

A second and more detailed agreement was signed a few days after the first. It contained the same promise of indemnification of Berry as the first one did, and the consideration was that Berry should convey The Homestead to the corporation. The contention of the respondents: that this was no valid contract because Berry neither did nor agreed to do anything which he was not already obliged to do, is based upon an acceptance of the facts as respondents contend them to be. Berry does not claim otherwise than that the corporation was the real buyer of The Homestead and entitled to the conveyance. What he does claim is that it was taken in his own name to provide security for repayment to him by the corporation of the funds he personally borrowed to purchase it, which security he gave up by conveying the property to the corporation and resigning as its president. Respondents' position to the contrary simply results in a dispute as to material issues of fact which should be resolved by a trial.

In view of the necessity to remand this case for trial it is appropriate to make ob-

servations on some of the other contentions made :[4]

■ 1. That the purported board of directors meeting of November 11, 1965, where the agreement was arrived at and signed was not legally called and its action was of no effect.

Comment: Berry is claiming that respondents contracted as individuals to hold him harmless; how they got together is not of critical importance.

■ 2. That the agreement to hold Berry harmless from "all activities" is too indefinite to be an enforceable contract; and that it is broad enough to include criminal activities which would make it void as against public policy.

Comment: The latter is so captious as to be irksome and tend to detract from such merit as the other aspects of the contention may have. There is a presumption that the activities intended are lawful. In the situation thus far disclosed, and from the context of the agreements, it would seem that a fair and reasonable understanding of the term "activities" would be relating to Berry's conduct in carrying on the corporation's business.

3. Finally, respondents urge that they are not bound on the hold harmless agreements because the signatures of some of the intended signers were never obtained. The first agreement stated that the "existing directors" would hold Berry harmless, yet there were three directors who were not . present and did not sign. The second agreement names the five respondents as parties, yet two of them did not sign. It is urged that there was no intent that respondents be bound until and unless all had signed.

■ Comment: Even where it appears that it was intended that others sign an agreement, it is not necessarily invariably true that all must sign before any are bound.[5] This depends upon the agreement and whether it appears that part of the consideration for signing was that others would also sign and be bound jointly with them.[6] It is usually to be assumed that the parties signing an agreement are bound thereby unless it appears that they did not so intend unless others also signed.

The uncertainties discussed in points 2 and 3 above emphasize the necessity and the propriety of a trial of the issues of fact and the taking of evidence as to the background

4. That where a new trial is ordered, questions of law which may be involved should be passed upon, Rule 76(a), U.R. C.P., see Joseph v. W. H. Groves Latter Day Saints Hospital, 7 Utah 2d 39, 318 P.2d 330.

5. John v. Marshall, 103 Cal.App.2d 172, 229 P.2d 367; Winter v. Kitto, 100 Cal. App. 302, 279 P. 1024.

6. John v. Marshall, supra; Winter v. Kitto, supra; 17 C.J.S. Contracts § 62.

**358**

and circumstances of the transaction in order to determine what the parties intended.[7]

Remanded for further proceedings. Costs to defendant Berry (appellant).

CALLISTER, TUCKETT, and ELLETT, JJ., concur.

HENRIOD, J., concurs in the result.

---

7. Palman v. Reynolds, 310 Mich. 35, 16 N.W.2d 657; Continental Bank & Trust Co. v. Stewart, 4 Utah 2d 228, 291 P. 2d 890.